# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSSETTS

TIMOTHY SCALONA, on behalf of herself
and all others similarly situated,

       *Plaintiff,*

    v.

CAPITAL ONE BANK USA, N.A.,

       *Defendant.*

Civil Action

Case No. _____

JURY DEMANDED

## CLASS ACTION COMPLAINT

On behalf of himself and all others similarly situated, Plaintiff Timothy Scalona ("Plaintiff" or "Mr. Scalona"), through his attorneys, respectfully alleges as follows:

### NATURE *of the* ACTION

1.     This is a civil action brought against Defendant Capital One Bank USA, N.A. ("Capital One" or "Defendant") pursuant to Section 54A of Chapter 93 of the Massachusetts General Law ("M.G.L"), and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.     The responsibilities of creditors to properly use and accurately report consumer information are essential in ensuring fairness and accuracy in credit transactions, which are the heart of the FCRA and M.G.L.

3.     Defendant routinely fails to comply with these responsibilities by inaccurately reporting fraudulent accounts to consumer reporting agencies.

4.     Defendant compounds this error by failing to correct its inaccurate reporting when it is notified directly about a dispute and when it receives notification indirectly from a consumer reporting agency of consumer disputes, and even police reports, concerning the fraudulent accounts it has been credit reporting.

## *The* PARTIES

5.      Plaintiff Timothy Scalona is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c), and resides in Brighton, Massachusetts.

6.      Capital One USA, N.A. is a national bank with over $480 billion in assets, headquartered in McLean, Viriginia. It offers a variety of financial products to consumers including credit cards.

7.      Capital One USA, N.A. regularly conducts business in Massachusetts

8.      Capital One USA, N.A. is a "furnisher" of information as used by FCRA § 1681s-2(a) & (b) which regularly and in the ordinary course of business furnishes credit information to one or more consumer reporting agencies ("CRAs"), about consumer transactions or experiences with any consumer.

## JURISDICTION *and* VENUE

9.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p in that all claims are brought under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*

10.     Venue lies proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to this action occurred within this District.

11.     Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

### Applicable legal framework FCRA

12.     "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).

13.     The FCRA is intended "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant,

3

and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010).

14.    FCRA-covered entities must follow procedures in reporting consumer credit information that both "meet[ ] the needs of commerce" and are "fair and equitable to the consumer." *Saunders v. Branch Banking and Tr. Co. of Virginia*, 526 F.3d 142, 147 (4th Cir. 2008) (quoting 15 U.S.C. § 1681(b)).

15.    In addition to well-known CRAs like the "big three" (Equifax, Experian, and Trans Union), the FCRA regulates the conduct of "furnishers of information," entities that provide—or "furnish"—information about consumers to CRAs, such as financial institutions like Capital One.

16.    Upon receipt of a consumer's request, a CRA must "provide notification of the dispute to [the furnisher] who provided any item of information in dispute."

17.    Furnishers of information, like Defendant here, are required under the FCRA to provide accurate information to CRAs. *See* U.S.C. § 1681s-2(a)(1).

18.    After receiving notice of the consumer's dispute indirectly through a CRA, a furnisher (like Capital One) must "conduct an investigation with respect to the disputed information[,] . . . review all relevant information provided by [the CRA, and] report the results of the investigation to the [CRA]." 15 U.S.C. § 1681s 2(b)(1)(A)-(C).

19.    The FCRA accordingly requires furnishers of credit information, like Capital One, to "conduct a reasonable investigation of [its] records to determine whether the disputed information can be verified." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004); *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37 (1st Cir. 2010); *Saunders*, 526 F.3d at 148 (the "FCRA requires furnishers to determine whether the information that they previously reported to a CRA is 'incomplete or inaccurate.'") (citation omitted).

20.    If the disputed information "is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," the furnisher must promptly "modify that item of information," "delete that item of information," or "permanently block the reporting of that item of information." 15 U.S.C. § 1681s 2(b)(1)(E)(i)-(iii).

21.    The FCRA was amended by Congress in 2003 by the Fair and Accurate Credit Transaction Act ("FACTA"), Pub L. No. 108-159 (2003), in part, to "prevent identity theft, improve resolution of consumer disputes, [and] improve the accuracy of consumer records."

22.    Prior to the 2003 amendments, victims of identity theft were afforded no special protections under the FCRA.

23.    The 2003 amendments made it easier for identity theft victims to get information resulting from identity theft removed from their credit reports.  By enacting 15 U.S.C. § 1681c-2(a), Congress required CRAs to block the reporting of any information in the file of a consumer that the consumer identifies as resulting from identity theft no later than 4 business days after receiving (1) appropriate proof of identity, (2) a copy of an identity theft report, (3) the identification of such information by the consumer, and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

24.    These blocking duties are in addition to furnisher's duties when responding to a consumer's dispute.

25.    The FCRA also places special duties on furnishers that specifically relate to any information that a consumer alleges results from an identity theft. *See* 15 U.S.C. § 1681s-2(a)(6).

26.    Once a consumer submits an identity theft report (which can be a police report) and states that the information resulted from identity theft, the furnisher must cease furnishing the fraudulent information unless the furnisher subsequently "knows" or is informed by the consumer that the information is correct. 15 U.S.C. § 1681s-2(a)(6)(B).

27. The 2003 amendments bridge the gap between the protections traditionally afforded to consumers by the FCRA and the unique experiences of victims of identity theft, such as Mr. Scalona.

28. The complete and accurate furnishing of information about *all* consumers—included victims of identity theft—is important because even small errors can disproportionately influence the cost of certain services, such as mortgages, automobile loans, and credit cards.

*Applicable Legal Framework – Massachusetts General Law*

29. Section 1681t(b)(1)(F) of the FCRA explicitly carves out an express exemption into state law preemption for Massachusetts and California.

30. Massachusetts General Law Chapter ("M.G.L.") 93 § 54A(g) provides a private remedial scheme which states that "a person who furnishes information to a consumer reporting agency shall be liable for failure to comply with the provisions of this section, unless the person so furnishing the information establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, such person maintained reasonable procedures to comply with such provisions."

31. Defendant is a furnisher of consumer credit information as defined under M.G.L. c. 93 § 54A(a).

32. Defendant violated M.G.L. c. 93 § 54A(a) by failing to establish reasonable procedures to ensure that the fraudulent information is not reported to consumer reporting agencies.

33. Relevant here, M.G.L. further prohibited Defendant from furnishing information about consumers to consumer reporting agencies which Defendant knew or had reason to know was inaccurate or incomplete. M.G.L. c. 93 § 54A(a).

*Capital One's Business Practice*

34.    Defendant Capital One is a bank specializing in services pertaining to credit cards, auto loans, banking, and savings accounts.

35.    In its normal course of business, Capital One maintains detailed business records concerning, *inter alia*, credit card holders' balances and account information and history.

36.    Capital One routinely furnishes this information to CRAs, including Experian, Equifax, and Trans Union, making it a "furnisher of information," as contemplated by the FCRA.

37.    Capital One, however, routinely fails to meet applicable legal standards in its treatment of disputes from victims of identity theft and thereby fails to proffer accurate information upon which CRAs can rely for their consumer reports.

38.    Capital One routinely shifts the burden to the consumer by continuing to hold consumers liable for the debts they incur as a result of alleged identity theft.

39.    Capital One continues to report inaccurate information, even when presented with police reports from the identity theft victim.

40.    CRAs understand this information to have meaning relevant to the creditworthiness and credit reputations about whom it furnishes information and incorporate that information into consumers' credit files and use it to prepare and sell consumer reports about them, whether in full or in summary form (*e.g.,* a credit score).

41.    Actors in the credit industry rely on these consumer reports to accurately set forth consumers' outstanding debt, history of repayment, and other financial characteristics.

42.    Capital One's practices directly contribute to the denial of credit opportunities for consumers, offers of adverse interest rates, and cause real, demonstrable harm to consumers.

*Plaintiff's Experience*

43.    At some point in 2023, Mr. Scalona reviewed his credit report, which showed four accounts that were not familiar to him—two of which were from Capital One ("the Capital One accounts" or "the accounts,") and two which were from First Premier Bank.

44.    Plaintiff is a victim of identity theft. Unbeknownst to him at the time, and shortly after his 18th birthday, the Capital One accounts were opened under his name.

45.    Plaintiff now believes that these accounts were opened fraudulently by his estranged stepfather.

46.    At no point in time did Plaintiff use, authorize to use, or benefit from the use of the Capital One accounts.

47.    Capital One subsequently reported these fraudulent accounts on Plaintiff's credit reports with TransUnion, Experian, and Equifax.

48.    After discovering these fraudulent accounts, Plaintiff filed a police report with the Boston Police Department and an Identity Theft Report with the Federal Trade Commission ("FTC") on or about July 21, 2023.

*Plaintiff First Disputes to Capital One and Credit Reporting Agencies*

49.    On or about July 26, 2023, Plaintiff contacted Capital One to directly dispute the two fraudulent accounts. Plaintiff sent a detailed letter outlining the basis for his dispute and included the police report and the FTC Identity Theft Report.

50.    On or around July 26, 2023, Plaintiff also indirectly disputed the fraudulent Capital One accounts with Defendant by sending detailed letters to TransUnion, Equifax and Experian. Plaintiff included, among other things, the police report and FTC Identity Theft report. Plaintiff requested that the inaccurate information be removed.

51.     In response to Plaintiff's dispute letter, upon information and belief, each of the consumer reporting agencies (TransUnion, Equifax and Experian) in turn communicated the dispute to Capital One in accordance with section 1681i of the FCRA.

52.     On August 25, 2023, TransUnion responded to Plaintiff's dispute and stated that Capital One had purportedly verified the two fraudulent accounts as accurate.

53.     On September 4, 2023, Experian responded to Plaintiff's dispute in writing that the fraudulent accounts had been purportedly verified as accurate by Capital One and that Capital One purportedly had "certified to Experian that the information was accurate."

54.     It is unknown how Capital One responded to Equifax concerning Plaintiff's July 26, 2023, dispute in this timeframe, nevertheless, Capital One continued to report these fraudulent accounts on Plaintiff's credit reports for TransUnion, Equifax, and Experian in August 2023 and beyond.

*Second Disputes to Capital One and Block Requests to Credit Reporting Agencies*

55.     On September 9, 2023, Plaintiff once again sent correspondence to Capital One requesting that it remove the fraudulent accounts from his credit report due to identity theft.

56.     On September 9, 2023, Plaintiff requested a block pursuant to § 605B of the FCRA from Experian and TransUnion.

57.     On September 16, 2023, TransUnion improperly rejected the fraud block request and instead contacted its client Capital One about the fraudulent credit accounts. A few days later, and on September 19, 2023, TransUnion sent additional correspondence to Plaintiff which stated that the information relating to the Capital One accounts had been purportedly "verified as accurate" by Capital One.

58.     On September 21, 2023, Experian similarly replied to Plaintiff that the information relating to his accounts was purportedly "verified as accurate" by Capital One.

*Third Dispute to Capital One and Requests to Block to Credit Reporting Agencies*

59.    On December 8, 2023, Plaintiff disputed the fraudulent Capital One accounts with Capital One for a third time and submitted documentation showing that he had been the victim of identity theft.

60.    Plaintiff once again requested a block pursuant to § 605B of the FCRA of the Capital One accounts from TransUnion, Experian and Equifax submitting the FCRA required police report and/or the appropriate FTC Identity Theft report.

61.    In response to Plaintiff's dispute letter, upon information and belief, each of the consumer reporting agencies (Trans Union, Equifax and Experian) in turn communicated the dispute to Capital One in accordance with section 1681i of the FCRA.

*Removal and Reinsertion of Capital One Fraudulent Accounts*

62.    In January and February 2024, Experian and TransUnion finally deleted and removed the Capital One accounts from Plaintiff's credit report, blocking it from appearing on Plaintiff's credit reports.

63.    But this reprieve was short lived.  At the direction of Capital One the CRAs reinserted the same accounts in Plaintiff's credit report days after granting the block.

64.    Specifically, on or about February 14, 2024, Plaintiff received correspondence from Equifax that stated in relevant part: "As a result of a dispute you submitted, the account [the Capital One account] was removed from your Equifax credit file. The company that furnished the account information recently requested to have the account information reinserted on your Equifax credit file."

65.    On February 17, 2024 Trans Union reinserted the Capital One accounts it had previously deleted stating that because the items were purportedly "verified; therefore, [they] can be added back to your credit report."

66.    On or about February 19, 2024, Plaintiff received correspondence from Experian which stated:

> Since we sent you an updated personal credit report reflecting that certain items on your report were blocked due to fraud, we have obtained additional information concerning the blocked transaction(s). The additional information indicated that either:
>
> - The request to block information was based on a material misrepresentation
> - You have agreed in writing that the information was blocked in error
> - You knowingly obtained or should have known that you obtained possession of goods, services, or moneys as a result of the blocked transaction or transactions.
>
> Therefore, the information previously blocked has been reinserted to your personal credit report. Should you need additional information, please refer to the attached copy of your personal credit report for the name, address and phone number (if available) of the data furnisher of the information that was unblocked. If you still believe the item is inaccurate, then we will add a statement of continued dispute to the personal credit report at your request.

67.    Upon information and belief, Experian reinstated the Capital One accounts onto Plaintiff's credit reports at the direction of Capital One.

68.    Capital One understood the nature of Plaintiff's disputes when it received information from the CRAs on multiple occasions, including the police report and FTC report that Plaintiff filed concerning the fraudulent accounts.

69.    Although Defendant continued to credit report the fraudulent accounts, Capital One did not know that the Plaintiff had opened the two accounts in question or that he was not a victim of identity theft as he claimed in his disputes.

70.    Although Defendant continued to credit report the fraudulent accounts, Capital One never had any communication from Plaintiff that his claims of identity theft were incorrect.

71.    Further, although it received Plaintiff's indirect disputes through the CRAs, Capital One failed to conduct a reasonable reinvestigation of each such dispute and failed to remove the fraudulent Capital One accounts from Plaintiff's credit reports as it could have.

11

72.    Plaintiff also disputed two First Premier Bank accounts on the basis of the same identity theft and provided the required supporting documentation. Even though First Premier Bank deleted the accounts from Plaintiff's credit reports, Defendant persistently continued to report the accounts despite the fact that these were also the product of identity theft and/or fraud.

73.    This is not unusual. In a lawsuit filed in the Southern District of New York, the plaintiff claimed that although she notified several credit card companies and other business that she was a victim of identity theft, only Capital One continued to report the fraudulent accounts on his credit report. *See Hansen v. Equifax Information Services,* Case No. 1:24-cv-100029-LJL (S.D.N.Y. Feb. 20, 2025).

*Capital One's Conduct Causes Substantial Harm*

74.    As a result of Defendant's conduct, Plaintiff has suffered actual damages in the form of harm to credit reputation and credit score, emotional distress (including humiliation and embarrassment) and wasted time and resources.

75.    By continuing to report Plaintiff and Class Member's fraudulent accounts, Capital One's actions reflected negatively upon Plaintiff and Class Member's credit repayment history and their financial responsibility.

76.    These misrepresentations, especially in the case of Plaintiff which included fraudulent accounts which ended as charge-off accounts, have harmful, real-world consequences. According to Experian, one of the three largest CRAs, a charge-off account is "a derogatory entry in your credit file—a serious negative event—and it can adversely affect your credit scores and your ability to borrow additional funds."[1]

---

[1] EXPERIAN INFORMATION SOLUTIONS, INC., *What is a Charge-Off?,* May 29, 2024, *available at* https://www.experian.com/blogs/ask-experian/what-is-a-charge-off/ (last visited July 30, 2025).

77.     By continuing to report Plaintiff and Class member's fraudulent accounts, Capital One also misrepresented Plaintiff and Class Members' total amount of indebtedness to one or more CRAs.

78.     Because the total amount a consumer borrows affects their credit score, "[a]mounts owed are responsible for about 30% of your FICO® Score,"[2] and a consumer's "total credit usage" is "highly influential" in the calculation of the consumer's VantageScore, a credit scoring model created by Experian, TransUnion, and Equifax.[3]

79.     Having a good credit score can make the difference between qualifying or being denied an important loan "[a]nd, it can directly impact how much you'll have to pay in interest or fees if you are approved."[4]

80.     Upon information and belief, Capital One's reporting of fraudulent accounts, which misstates the Plaintiff and Class Members' total debt burdens, caused a diminution of Plaintiff and Class Members' credit scores, harming their ability to obtain credit.

81.     Upon information and belief, Capital One's inaccurate reporting of fraudulent accounts caused Plaintiff's credit score to decrease.

82.     Consumers about whom Capital One furnished inaccurate information are further injured by its misrepresentations when CRAs sell consumer reports about them to their existing

---

[2] EXPERIAN INFORMATION SOLUTIONS, INC., What Affects Your Credit Scores?, July 29, 2023, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-affectsyour-credit-scores/ (last viewed July. 30, 2025).
[3] EXPERIAN INFORMATION SOLUTIONS, INC., What Is a VantageScore Credit Score?, June 25, 2024, *available at* https://www.experian.com/blogs/ask-experian/what-is-a-vantagescore-credit-score/ (last viewed July. 30, 2025).
[4] EXPERIAN INFORMATION SOLUTIONS, INC., What Is a Good Credit Score?, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-is-a-good-creditscore/ (last viewed July. 30, 2025).

creditors and/or service providers (so-called "soft" inquiries), which can result in the additional financial harm of higher interest rates or insurance premiums.

83.     Furthermore, in addition or in the alternative to the foregoing harm, the inaccurate reporting Capital One furnished about Plaintiff and Class Members cast them in a negative false light and interfered with their ability to control their personal information.

84.     This sort of injury has long been understood to be an invasion of common-law right to privacy. *Long v. Se. Penn. Trans. Auth.,* 903 F.3d 312, 324 (3d Cir. 2018).

85.     Defendant's false light portrayal of Plaintiff and Class Members caused them to feel distraught, angry, powerless, and distressed.

86.     Plaintiff and Class Members manifested these negative emotional responses to Defendant's inaccurate reporting by disputing it with one or more CRAs and/or directly with Capital One.

87.     Plaintiff was sufficiently upset by Defendant's false light portrayal as delinquent and skipping out on debts that he disputed the fraudulent accounts with Capital One and all three CRAs on multiple occasions.

88.     Further, in addition to or in the alternative to the foregoing harms, Defendant's failure as a matter of policy and/or practice to correct the inaccurate information it had previously furnished about Plaintiff and Class Members to one or more CRAs injured them by wasting time and resources invested in their disputes and requests for blocks based on identity theft.

89.     Because making a dispute based on identity theft requires many steps which requires consumers to expend time and financial resources, it is not economically neutral.

90.     First, consumers must obtain a copy of their credit report and carefully review it to locate the inaccurate and fraudulent information. Second, they must prepare a letter or other writing identifying the information and explaining why it is inaccurate and fraudulent. In

cases of identity theft, consumers must also go to the police department to make a complaint. At the police departments they must verify information under penalty of perjury. Many victims of identity theft have been forced to take days and weeks off to deal with police departments and on hold with banks, CRAs and/or debt collectors. The consumer must report the identity theft to the Federal Trade Commission ("FTC") and prepare another report. This is in addition to having to comply with any CRA specific forms and requirements. Third, consumers must print their letters and any supporting documents, such as identification documents or correspondence from a third party, which consumes paper and printing resources. Finally, consumers must properly address their letters, place them in an envelope, and pay for postage, often including additional fees for delivery confirmation and return receipts.

91.     Plaintiff spent time filing a police report with the Boston Police Department, completing an FTC identity theft report, reaching out to Capital One and writing several dispute letters with multiple exhibits and sending it to various CRAs.

92.     Plaintiff spent a total of $91.95 to send his disputes to Experian and Equifax alone.

93.     When Defendant, as a matter of policy and/or regular practice, fails to correct the inaccurate information that Plaintiff and Class Members have disputed, all of the above-noted time and resources goes to waste.

94.     Federal courts "have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish [Article III] standing." *Healy v. Milliman, Inc., No.* C20-1473 (JCC), 2022 WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022) (collecting cases); *see also Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("Because there is no question that wasted time is a concrete harm, [Plaintiff] has standing to pursue his claims."); *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 372-73 (E.D. Pa. 2023) ("Because wasted time and expense are concrete harms, Plaintiffs sufficiently establish

injury-in-fact on this theory[.]"); *Hines v. Equifax Info. Servs., LLC*, No. 19-CV-6701, 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022) ("[Plaintiff's] wasted time and expense is a traditional monetary harm that is fairly traceable to [defendant's] policy . . . and is redressable by judicial relief."), report and recommendation adopted as modified 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024); *Henkel v. Department of Education,* No. 1:24-cv-01676, 2025 WL 2049267 (D.C. Cir. July 22, 2025) (recognizing that wasted time and resources spent trying to remedy the Defendant's refusal to investigate and correct inaccuracies establish standing).

      95.    At all times pertinent hereto, Capital One was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

      96.    At all times pertinent hereto, Capital One's conduct, as well as that of its agents, servants and/or employees, was willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of the Plaintiff herein.

## CLASS ACTION ALLEGATIONS

      97.    Plaintiff brings this action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of one or more Classes of similarly situated consumers.

      98.    Plaintiff seeks to represent the following Classes:

**FCRA Section 1681s-2(b) National Class – No Investigation**

From August 1, 2023 until the date of the latest class certification order in this matter, all natural persons in the United States and its Territories for whom Defendant: (1) received a dispute on the basis of identity theft through a CRA; (2) in response to the dispute Defendant verified the account; (3) without reviewing any extrinsic document from its internal fraud department our any outside law enforcement authority.

**FCRA Section 1681s-2(b) National Class -- Failure to Properly Investigate and Delete Fraudulent/Blocked Account Information**

From August 1, 2023 until the date of the latest class certification order in this matter, all natural persons in the United States and its Territories for whom Defendant (1) responded to an Automated Credit Dispute Verification ("ACDV") coded 103 ("claims true identity fraud") by continuing to credit report the disputed account and (2) the disputed account had been previously blocked due to fraud or identity theft by a consumer reporting agency.

**Massachusetts General Law Chapter 93 § 54A(a) Credit Reporting Fraudulent Account Information**

From August 1, 2021, until the date of the latest class certification order in this matter, all natural persons in the Commonwealth of Massachusetts for whom Defendant (1) received a police report or FTC identity theft report in connection with a Capital One credit account disputed on the basis of fraud or identify theft, and (2) in the month after receiving police report or FTC identity theft report, Capital One continued to furnish that credit account to one of more consumer reporting agencies.

99. **Numerosity. FED. R. CIV. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Although the precise number of Class members is known only to Defendant, Plaintiff avers upon information and belief that disputes related to fraudulent accounts and fraudulent charges along with identity theft reports minimally number in the thousands.

100. **Existence and Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Classes and predominate over the questions affecting only individual members. The common legal and factual questions include, *inter alia*, whether Class Members disputed fraudulent and inaccurate information that Capital One had furnished to a CRA about them; whether Class Members provided a police report or FTC identity theft report in their disputes; whether Capital One failed to correct the disputed information; whether Defendant's conduct was negligent, willful, or

17

reckless; and whether the members of the Classes are entitled to statutory damages, actual and/or punitive damages, and in what amounts.

101.    **Typicality.** FED. R. CIV. P. **23(a)(3).**  Plaintiff's claims are typical of the claims of each Class member. The Plaintiff has the same claims for statutory and punitive damages that he seeks for absent class members.

102.    **Adequacy.** FED. R. CIV. P. **23(a)(4).**  Plaintiff is an adequate representative of the classes.  His interests are aligned with, and are not antagonistic to, the interests of the members of the classes he seeks to represent, he has retained counsel competent and experienced in such litigation, and he intends to prosecute this action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of members of the Classes.

103.    **Predominance and Superiority.** FED. R. CIV. P. **23(b)(3).**  Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Capital One's conduct.  It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them.  Even if the Class members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Capital One's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

18

# CLAIM *for* RELIEF

## COUNT I
### (No Investigation Class Claim)

*Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b)*

104.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

105.    In response to a notice of a claim of identify fraud through a CRA Defendant verified the account without reviewing any extrinsic document from its fraud department or outside law enforcement authority. Defendant negligently or willfully continued to report the disputed account, continued to fail to correct the error, and failed to fulfill all of its duties under 15 U.S.C. § 1681s-2(b).

106.    Plaintiff is therefore entitled to recover from Capital One the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

107.    Capital One is liable to Plaintiff and members of the Class for all relief available pursuant to FCRA sections 1681n and 1681o.

## COUNT II
### (Failure to Property Investigate and
### Delete Fraudulent/Blocked Account Information Class Claim)

*Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b)*

108.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

109.    After receiving notice of a claim of true identify fraud from a CRA and after the disputed account had been previously blocked due to fraud or identity theft, Defendant negligently or willfully continued to report the disputed account, continued to fail to correct the error, and failed to fulfill all of its duties under 15 U.S.C. § 1681s-2(b).

19

110.    Plaintiff is therefore entitled to recover from Capital One the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

111.    Capital One is liable to Plaintiff and members of the Class for all relief available pursuant to FCRA sections 1681n and 1681o.

## COUNT II
## (Class Claim)

*Violation of Mass. Gen. Law 93 § 54A(a)*

112.    Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

113.    Defendant is a furnisher of consumer credit information as defined under M.G.L. c. 93 § 54A(a).

114.    Defendant violated M.G.L. c. 93 § 54A(a) when after receiving a police report or FTC Identity Theft Report from a consumer claiming inaccurate reporting based on fraud or identity theft, it continued to furnish the fraudulent account to one of more consumer reporting agencies.

115.    After receiving notice of inaccurate reporting, Defendant failed and continues to fail to correct the error in violation of M.G.L. c. 93 § 54A(a).

## PRAYER *for* RELIEF

WHEREFORE, Plaintiff and the Class pray for relief as follows:

A.      An order certifying the case as a class action on behalf of the proposed Classes under Federal Rule of Civil Procedure 23 and appointing Plaintiff and the undersigned counsel of record to represent same;

B.      An award of actual, statutory and punitive damages for Plaintiff and the Classes;

C.      An award of pre-judgment and post-judgment interest as provided by law;

D.     An award of attorneys' fees and costs; and,

E.     Such other injunctive or equitable relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Date:  July 31, 2025

Respectfully submitted,

BY:    Christopher M. Lefebvre, Esq.
Consumer & Family Law Center of
Claude F. Lefebvre | Christopher M. Lefebvre, PC
PO Box 479 • Pawtucket • 02862
Tel: (401) 728-6060 • Fax: (401) 728-6534
chris@lefebvrelaw.com
BBO# 629056

John Soumilas
Maria del Pilar Castillo*
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA  19103
Tel.: (215) 735-8600
Fax: (215) 940-8000
jsoumilas@consumerlawfirm.com
pcastillo@consumerlawfirm.com
 *Pro hac vice* application forthcoming

*Attorneys for Plaintiff and the Class*

21